UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

JOHNNY WILLIAM COFFEY,            )
                                 )
        Petitioner,              )
v.                               )        No.    1:15-CV-5-HSM-SKL
                                 )
DAVID SEXTON,                    )
                                 )
        Respondent.              )


**<u>MEMORANDUM OPINION</u>**

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed by *pro se* prisoner Johnny William Coffey, challenging the constitutionality of his confinement under a state court judgment of conviction of second-degree murder [Doc. 1].  Respondent filed a response in opposition, as well as a copy of the state record [Docs. 7 and 10].  For the reasons set forth below, Petitioner's § 2254 petition [Doc. 1] will be **DENIED** and this action will be **DISMISSED**.

I.    **PROCEDURAL HISTORY**

Petitioner was convicted of second-degree murder and sentenced to twenty years' imprisonment.  *State v. Coffey*, No. E2011-00192-CCA-R3CD, 2012 WL 362969, at *1 (Tenn. Crim. App. Feb. 6, 2012), *perm. App. Denied* (Tenn. Apr. 11, 2012).  Petitioner appealed the jury conviction claiming that the trial court erred by denying him funds to procure additional expert assistance, by denying his request to play witness statements in their entireties, by refusing to grant his motion for a mistrial, by denying his request for a jury instruction on self-defense, and by failing to apply certain mitigating factors to reduce his sentence.  *Id*.  Discerning no reversible error, on February 6, 2012, the Tennessee Court of Criminal Appeals ("TCCA") affirmed the trial

court's judgment. *Id*. at *13. Petitioner sought permission to appeal to the Tennessee Supreme Court ("TSC"), but his request was denied by the court on April 11, 2012. *Id*. at *1.

On November 19, 2012, Petitioner filed a *pro se* petition for post-conviction relief, alleging forty-eight grounds for ineffective assistance of counsel. [Doc. 7, State Court Record Attachment 26]. Petitioner was subsequently appointed counsel, and an amended petition for post-conviction relief was filed contending that trial counsel was ineffective for: (1) failing to properly petition the trial court for a State-funded independent expert to assist in the Petitioner's claim of diminished capacity or self-defense; and (2) failing to adequately investigate and present evidence at trial of Petitioner's mental condition and level of intoxication at the time of the offense [*Id*.]. Following an evidentiary hearing on the matter, the post-conviction court denied the petition on June 13, 2013 [*Id*.]. On April 23, 2014, the TCCA affirmed the post-conviction court's denial of relief and on August 26, 2014, the TSC denied review. *Coffey v. State*, No. E2013-01659-CCA-R3PC, 2014 WL 1632765, at *1 (Tenn. Crim. App. Apr. 23, 2014).

Petitioner then filed the instant petition for writ of habeas corpus on January 9, 2015 [Doc. 1]. This matter is now ripe for the Court's review.

## II.     FACTUAL BACKGROUND

The following factual background is taken from the TCCA's opinion on appeal;

> The defendant's conviction relates to the stabbing death of the victim, Jesse Schoate, on September 27, 2008. On that date, William Burrell and some others organized a 30th birthday party for Misty Thompson to be held in a vacant field. Ms. Thompson testified at trial that Mr. Burrell had selected the location, procured a keg of beer, and hired a band for the evening's entertainment. Guests were invited via flyer or handbill to bring tents to camp overnight. Ms. Thompson said that she arrived for the party at approximately 6:00 p .m. to help set up and that Mr. Burrell was mowing the area. She met the defendant for the first time when he offered to help her set up her tent, and she accepted his help. As they worked, the defendant asked her, "Who's the lucky man tonight?" She told him, "No one," and she explained that it was her birthday and that she intended to "have fun." When the defendant remarked that he might be sleeping with her, she told him, "No." She

2

explained that the defendant "wasn't really too aggressive" when he made the comment. At that point, Autumn Cooper arrived with the victim. Shortly thereafter, others arrived, and the party began in earnest.

Ms. Thompson said that she and the others were drinking beer and that the victim primarily stayed seated next to the campfire. She stated that she did not pay any particular attention to the defendant during the party because she "didn't know him." She recalled that she became sleepy "probably around 12 o'clock" and went to her tent. Ms. Thompson testified that she "passed out" as soon as she got into her tent and that the next thing she remembered was "[a] cop crawling in [her] tent waking [her] up." She did not witness any altercation between the defendant and the victim.

Karen Jackson Vetten testified that she knew the defendant as a friend of Mr. Burrell. She and her husband attended Ms. Thompson's party on September 27, 2008, arriving at approximately 9:15 p.m. She said that at one point during the evening, her husband and Mr. Burrell asked the defendant to leave the party because of his behavior. Ms. Vetten explained that the defendant had "grabbed [her] butt" and had gotten into the background of several photographs "making sure he was known" by "obscene" gestures. She said that she "got in between them and pushed them apart" after the men started bickering. She and her husband then walked away, and the defendant followed them "dragging his leg" and asking her to "help him." She said she started to help the defendant but her husband would not allow it. She and her husband left the party at "[a]round 11:15 or 11:30."

Cassie Brown, Mr. Burrell's girlfriend at the time of the murder, helped Mr. Burrell plan Ms. Thompson's party. While helping Mr. Burrell set up for the party, Ms. Brown realized they needed some items, so she went to the store. When she returned, the defendant was there, which she thought odd because the defendant had not been invited to the party. Later that evening, she and the defendant were sitting around the campfire drinking beer when they saw "headlights coming over the hill" toward the party. The defendant told Ms. Brown "that he didn't know who it was, but he was gonna go get a shotgun out of his truck." She said she told him to "shut up." The defendant remained beside the fire.

When the band finished playing at midnight, people began to leave, and Ms. Brown "climbed into the van and went to sleep." At approximately 2:00 a.m., "[t]here was a lot of screaming and banging on the van door." When she opened the van door, Ms. Brown saw the victim "laying on the ground" and the defendant "on the other side of" the fire "with a knife in his hand, just covered in blood." Ms. Brown testified that she "[a]utomatically" wrapped the victim in a blanket and began cardiopulmonary resuscitation ("CPR"). She said that the victim "had a large gash underneath his left arm," and Ms. Cooper and the defendant were trying to get the victim into the van. Then she saw the defendant pull the victim's feet so that they could not actually get the victim into the van. She said that she never saw the defendant attempt to render aid to the victim.

Autumn Cooper testified that she and the victim, who were dating at the time, attended Ms. Thompson's birthday party together. She met the defendant for the first time when she arrived for the party and saw him with Mr. Burrell. Ms. Cooper said that later that evening, she saw the defendant with his hands inside Ms. Thompson's tent "feeling around on her legs." When Ms. Cooper asked the defendant what he was doing, he said, "She's unconscious .... she's dying." Ms. Cooper ordered the defendant out of the tent and got into the tent with Ms. Thompson. She recalled that she stayed for 15 to 20 minutes talking with Ms. Thompson until Ms. Thompson fell asleep. After she left Ms. Thompson's tent, Ms. Cooper got some snacks for herself and the victim. She returned to the tent the couple was sharing, and they began to eat.

Ms. Cooper said that she and the victim ate for a few minutes and "pick[ed] at" one another before deciding to go to sleep. The victim went outside to urinate. Ms. Cooper said that she could hear the victim urinating and that she heard the defendant say, "You know you like it." The victim said, "I don't know what you're talking about, man," and the defendant said, "Why don't you come down to the campfire with me?" Ms. Cooper testified that the victim refused and told the defendant to "go to bed and leave [them] alone" before zipping the tent. She recalled that the defendant then unzipped the tent, and the victim again told the defendant to leave and zipped the tent. At that point, the defendant stepped down onto the tent and onto Ms. Cooper's chest. She said that she and the victim tried to be quiet because they were unsure what the defendant might do next.

The defendant then began kicking and pulling the tent to the ground with Ms. Cooper and the victim inside. She said that they immediately began groping for the zipper. The victim found the zipper and started crawling out, with Ms. Cooper close behind him. Ms. Cooper said that when she emerged from the tent she saw the defendant and the victim on the ground. She testified that Mr. Burrell attempted to separate the men. Suddenly, the defendant looked at Ms. Cooper and said, "He's bleeding, he's bleeding." The defendant pulled the victim to his feet, and Ms. Cooper saw that he had been stabbed. Ms. Cooper said that she immediately began looking for her car keys so that she could take the victim to the hospital. She explained that cellular telephones would not work in the remote area. When she could not find her own keys, she decided to try to get the victim to the van where Ms. Brown was sleeping. The defendant helped her carry him.

During cross-examination, Ms. Cooper admitted that she told officers that the victim "went after" the defendant when he emerged from the tent, but she explained that the victim "didn't even have time to stand up" before the defendant attacked him.

Bradley County Sheriff's Office ("BCSO") Officer James Bohannon testified that he responded to a 1:30 a.m. call of a stabbing at a location on Bradford Lane in Charleston. When he arrived, he encountered Mr. Burrell, who was bleeding from

a cut on his hand and urging the officer to go to the victim in a nearby field. On his way, Officer Bohannon encountered the defendant "walking through the field" toward the scene and "covered in blood." The defendant did not speak to the officer but "pointed down the field to the direction of a white van" where another individual was performing CPR on the victim. Officer Bohannon took over CPR. As he performed CPR, the defendant walked up and sat down on the ground behind the officer and the victim. The defendant said "that he didn't mean to cut [the victim] so deep." At that point, Officer Bohannon briefly stopped CPR to handcuff the defendant.

The shirtless defendant had blood on his face, shoulders, and hair. When other officers arrived, the defendant told them that the murder weapon was in his pocket. Officer Bohannon took a small knife and a large knife from the defendant. The larger of the two weapons was covered in blood. He never saw the defendant attempt to aid the victim.

United States Secret Service Special Agent Joseph Lea testified that at the time of the murder he was working as a Detective with BCSO and that he acted as the primary investigator in the case. Detective Lea said that when he arrived on the scene, he observed the victim on the ground next to a white van. He recalled that a tent identified as belonging to the victim had been knocked to the ground, and witnesses said that the defendant had knocked it down. A trail of blood led from the tent to the victim's body. Detective Lea described the victim's injuries,

> He had a laceration about that long on his abdomen, another one long across his chest, another one that went the whole radius of his arm, and ... another cut to his back around the same area, and I believe his ear was also cut, the top part of his ear.

Detective Lea testified that toxicology testing showed that the victim's blood was negative for the presence of narcotics and that his blood alcohol level was .18 percent. Testing also established that the defendant's blood alcohol level was .10 percent and that his blood tested positive for the presence of propoxyphene, norpropoxyphene, dihydrocodeinone, and alprazolam. Forensic testing also established that the victim's blood was on the large knife confiscated from the defendant.

During cross-examination, Detective Lea conceded that the level of drugs in the defendant's system were within therapeutic limits. He also acknowledged that the location of the defendant's shirt at the crime scene was consistent with witness accounts that the defendant had attempted to use his shirt to stem the victim's bleeding. Finally, he acknowledged that Mr. Burrell told police that the defendant and the victim ran toward one another at the beginning of the altercation.

Knox County Medical Examiner Doctor Darinka Mileusnic–Polchan, who performed the autopsy of the victim, testified that the cause of the victim's death

"was multiple sharp force injuries; specifically, multiple incised wounds" and explained that the victim suffered "very long wounds that are relatively shallow, but some of them go deep enough into the body to injure major vessels." The first of these wounds, a "very deep incised wound that was on the inside all the way high up on the right arm," traveled right to left and went "all the way to the bone, it completely sever[ed] the major artery, which is the brachial artery." Because the wound severed a major artery, "the main mechanism of death" was "severe blood loss." Doctor Mileusnic–Polchan said that the orientation of the wound established that the victim sustained the wound while his arm was "raised not halfway, but all the way up."

A second wound to the victim's left chest traveled "front to back, right to left, and down ward, and ... toward the back of the body." Doctor Mileusnic–Polchan described "that particular wound" as "very, very deep," noting that the victim's "ribs are exposed." A third, similar wound to the victim's upper abdomen also traveled "front to back and kind of right to left" and was "very deep" and "very long." Doctor Mileusnic–Polchan testified that neither of the wounds to the front of the victim's body were life threatening but that the wound to the arm was life threatening "because of the involvement of the major vessels, the size of the vessels, the closeness to the heart, and the location. It's in an area that it's really hard to block the artery." The victim also suffered "two relatively superficial cuts" on his back and a superficial cut to his ear. In addition he had "a superficial abrasion" in the middle of his forehead and two "linear" blunt force trauma injuries on his neck.

During cross-examination, Doctor Mileusnic–Polchan testified that the wound inflicted to the victim's arm could not have occurred if the victim had the defendant in a headlock because "that would actually block [the affected area] more than really expose it." She conceded that the autopsy could not determine where the defendant and the victim were when the wounds were inflicted. Upon examining a photograph of the clothing worn by the defendant and the victim, however, she opined that the blood stains showed "that the victim and the assailant are facing each other."

Following Doctor Mileusnic–Polchan's testimony, the State rested. In addition, the State dismissed the count of the indictment charging the defendant with the aggravated assault of Mr. Burrell.

The defendant offered the testimony of William Burrell. Mr. Burrell testified that he knew the defendant but "wouldn't call him a friend." Nevertheless, he invited the defendant to Ms. Thompson's party. He said that the defendant "kept causing problems" throughout the evening culminating in the victim's murder. He recalled that in the minutes leading up to the stabbing, he heard the victim's "begging [the defendant] to leave him alone" and the defendant's telling the victim to come to the campfire. He also saw the defendant "stomping and kicking" at the victim's tent as the victim tried to get out of it. Mr. Burrell said that he ran toward the defendant just before the victim exited the tent. He said that "no sooner than [the victim]

came out of the tent, it was like [the victim and the defendant] fell straight down." He stated that he could not really tell what was happening, but he admitted that he told Detective Lea that it appeared that the victim "was beating Johnny up." He said that he tried to break up the fight, and the defendant "whacked off" his finger with a knife.

Doctor June Young, a Clinical Psychologist, testified that she evaluated the defendant and concluded "that he was competent to stand trial[ ] and that there was no support for insanity." She agreed that the defendant had been treated by a psychiatrist for "many years" and that he had had "[q]uite a few" mental hospitalizations. She said that she reviewed the records of the defendant's treating psychiatrist, Doctor Troy Gilson, and agreed that the defendant had been diagnosed with bipolar disorder. She did not review records of the defendant's hospitalization at Moccasin Bend for mental health issues, explaining that the hospitalization "was too far away from the time of the alleged crime to be relevant." Doctor Young explained that she only reviewed the defendant's records going back to 2007 because her "job was to determine his mental condition around the time of the crime, not for the past 15 years." She did review the records of his most recent admission to Peninsula Hospital. In addition to her review of the relevant records, Doctor Young met with the defendant for approximately 90 minutes. She agreed that the defendant continued to be affected by mental illness but concluded that the defendant's mental illness did not render him legally incompetent or insane. She emphasized, "My report does not say that he is not affected by mental illness. It simply states that his mental illness was not so severe as to interfere with his ability to appreciate the wrongfulness of his acts."

Doctor Young acknowledged that she did not speak directly with Doctor Gilson, explaining that she wanted to avoid a conflict of interest.

Renee Kimsey, who had previously maintained a romantic relationship with the defendant, testified that the defendant had "an unnatural fear" that he was being watched and that, on occasion, he "would talk to people that [she] didn't see." She recalled one specific occasion when she observed the defendant talking to "a teenage boy and a teenage girl" that were not really there. She said that the defendant had had several surgeries on his neck and his knees and that "[h]e's very protective of the areas that have been ... injured prior." Specifically, she stated that the defendant was "very fearful that if someone hit him or injured him that he could become paralyzed or even that it would kill him." During the weeks just prior to the offense, the defendant called her and told her that he was "chasing [her] through the woods" when she was not even in the same county.

Pamela Lightfoot, the defendant's cousin, testified that she saw Mr. Burrell at the defendant's residence and that he showed her a flyer and invited her to Ms. Thompson's birthday party. When she declined the invitation, Mr. Burrell said, "Well, what do you think about [the defendant] being the bouncer?" The defendant told Mr. Burrell "that he wasn't gonna be a bouncer." At that point, Ms. Lightfoot

"told them they w[ere] crazy" and left. On the following day, she again saw the defendant and Mr. Burrell together, and the pair were discussing the defendant's acting as a "bouncer" at Ms. Thompson's party. Mr. Burrell said, "Well, [the defendant's] got a gun permit. That's the reason I want [him] to do it." She told the defendant he would be "crazy" if he accepted the job.

The 41–year–old defendant testified that Mr. Burrell invited him to Ms. Thompson's birthday party and asked him to act as "a bouncer" because the defendant had both a handgun and a handgun carry permit. The defendant said that he told Mr. Burrell that he "wasn't able to be no bouncer, but [he would] show up." The defendant stated that prior surgery on his hands, knees, and neck prevented him from working as a bouncer.

He arrived at the party location at approximately 5:00 p.m. and helped Mr. Burrell set up for the party. The defendant said that he could not "remember much" of the struggle with the victim, explaining, "[I]t seems like ... he come running at me or something, and I throwed (sic) my hand up and said, 'Stop, wait,' or something to that effect. I mean, I can't really remember." He testified that the next thing he remembered was the victim's lying "there on the ground and he's cut, and I took my shirt off and put it on his side." The defendant claimed that he was frightened and confused at the time. The defendant insisted that he did not intend to kill the victim, saying, "I never planned on hurting nobody. I mean, I ain't never hurt nobody. I've always tried to do the right thing." He could not recall kicking the victim's tent prior to the homicide.

The defendant testified that in addition to his medical issues, he had been treated by Doctor Gilson for mental health issues for several years and had been hospitalized for those issues "a lot." The defendant said that he had been "attacked by trolls one time in [his] yard," explaining, "I didn't know where it come from. I didn't know where they come from at all, and then all at once, blam, there they was, you know, just on my legs and everything." He stated that he telephoned police, who transported him to the mental hospital. The defendant said that he often suffered from panic attacks. He conceded that he consumed alcohol "every once in a while" even though doctors told him that he should not do so while on medication. Based upon this evidence, the jury convicted the defendant of the lesser included offense of second degree murder. The trial court imposed a sentence of 20 years' incarceration to be served at 100 percent by operation of law.

*State v. Coffey*, 2012 WL 362969, at *1–7.

## III.    STANDARD OF REVIEW

The Court must review Petitioner's request for habeas corpus relief pursuant to the

standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

which allows state prisoners to seek federal habeas corpus relief on the ground that they are being held in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254; *Reed v. Farley*, 512 U.S. 339, 347 (1994). Congress has mandated that federal courts review state court adjudications on the merits of such claims using a "highly deferential" standard of review. *See, e.g.*, *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Under this deferential standard, this Court is bound to accept the state court's findings of fact as true unless a petitioner presents "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1)(providing that "a determination of a factual issue by a State court shall be presumed to be correct" unless the petitioner rebuts that presumption with clear and convincing evidence); *see Seymour v. Walker*, 224 F.3d 542, 551-52 (6th Cir. 2000). Additionally, this Court may not grant habeas relief to a state prisoner unless the state court's decision on the merits of his claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Clearly established federal law," for the purposes of § 2254(d)(1), refers to rulings of the United States Supreme Court in place at the time of "the last state-court adjudication on the merits." *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)(defining clearly established federal law as "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision"). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S.

362, 413 (2000). A state-court decision unreasonably applies clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

The standards set forth in the AEDPA's are "intentionally difficult to meet." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)). Ultimately, the AEDPA's highly deferential standard requires this Court to give the rulings of the state courts "the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

## IV.    ANALYSIS

Petitioner's § 2254 habeas corpus petition raises two main claims for relief and numerous sub-claims [Doc. 1]. The two main claims presented by Petitioner are claims of prosecutorial misconduct ("Claim 1") and ineffective assistance of trial counsel ("Claim 2") [*Id.*]. Respondent argues that all but one of Petitioner's sub-claims are procedurally defaulted and should be dismissed [Doc. 10]. Respondent claims that "none of the sub-claims in Claim 1" and "none but sub-claim 13 of Claim 2" have been fairly or adequately presented to the highest available state court in satisfaction of § 2254(b)'s exhaustion requirement [*Id.*]. Respondent further claims that the state court's denial of sub-claim 13 of Claim 2 was not contrary to and did not involve an unreasonable application of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and it was not based on an unreasonable determination of the facts in light of the evidence presented in state–court proceedings, and thus, should also be dismissed [*Id.*].

### A.    CLAIM 1: PROSECUTORIAL MISCONDUCT

Petitioner claims his conviction and sentence are void because the State engaged in improper conduct that deprived him of his rights under the Fifth, Sixth, and Fourteenth

Amendments [Doc. 1 p. 6].  Petitioner listed 14 sub-claims involving improper argument, questioning, and admission of evidence [*Id*.].  Specifically, the sub-claims are as follows:

(1)    The State improperly argued during its opening argument that its evidence would show that Petitioner provided Xanax to numerous people at the party when the State knew it had no supporting evidence. [Doc. 1 p. 6].

(2)    The State improperly used its opening argument as a vehicle for addressing possible defenses and evidence that it thought might be advanced by the defense. [Doc. 1 p. 15].

(3)    The State improperly argued during its opening argument that "the defense may say" that Petitioner was there to be a bouncer, and then argue personal opinion by stating: "The person that should have been bounced from the party was the defendant, the one that was causing trouble." [Doc. 1 p. 16].

(4)    The State offered proof of prior bad acts of Petitioner, and the defense was deprived of any opportunity to challenge this conduct outside the presence of the jury. [Doc. 1 p. 16].

(5)    The State, after the Court ruled that it could introduce a specific photograph because "it didn't show the handcuffs or anything", improperly questioned a witness so as to establish that Petitioner was wearing handcuffs when the photo was taken. [Doc. 1 p. 16].

(6)    The State intentionally inflamed the jury by admitting a prejudicial photograph, which had previously been ruled inadmissible. [Doc. 1 p. 16].

(7)    The State, during its examination of Ms. Thompson, improperly sought to prejudice Petitioner by alluding to theft by Petitioner without introducing any evidence of theft. [Doc. 1 p. 16].

(8)    The State, during its closing argument, improperly stated that Petitioner was "the only person there who was carrying a weapon. [Doc. 1 p. 17].

(9)    The State, during its closing argument, improperly argued that Petitioner "had altercations with every female there." [Doc. 1 p. 17].

(10)    The State, during its closing argument, improperly argued that it decline to pass certain exhibits for the jury to view because "we don't want to try to upset you." [Doc. 1 p. 17].

(11)    The State, during its closing argument, improperly mentioned the victim's emotional family life without further developing those statements by evidence. [Doc. 1 p. 17].

(12) The State, during its closing argument, improperly argued that Petitioner "has to be held responsible for his own actions" for acts that he was not even on trial for. [Doc. 1 p. 17].

(13) The State, during its final argument, improperly stated personal opinion as fact. [Doc. 1 p. 17].

(14) The State, during its final argument, made an improper argument about the victim's son, without proof that the victim was the child's father. [Doc. 1 p. 18].

Respondent argues that all of the sub-claims must be dismissed because they are procedurally defaulted and barred from review [Doc. 10 p. 20]. While Petitioner included prosecutorial misconduct claims in his *pro se* petition for state post-conviction relief [*see,* Doc. 7, State Court Record Attachment 26], he did not include those claims in his amended state petition or address them at the post-conviction hearing [*see,* Doc, 7, State Court Claim Attachment 26], nor did he present them to the TCCA [Doc. 10]. As such, Respondent states that Petitioner's claims of prosecutorial misconduct have not been exhausted, and therefore, must be dismissed [*Id*.].

Before a federal court may review a federal claim raised in a habeas petition, it must first determine whether the petitioner has exhausted the remedies available to him in state court. *See* 28 U.S.C. § 2254(b)(1). If a federal habeas claim has not been presented to a state court for adjudication, then it is unexhausted and may not properly serve as the basis of a federal habeas petition. *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

The exhaustion "requirement is satisfied when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Wilson v. Mitchell*, 498 F.3d 491, 498–99 (6th Cir. 2007) (quoting *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001)). Under Tennessee Supreme Court Rule 39, a Tennessee prisoner exhausts a claim by raising it before the TCCA. *See Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003). A federal court will not review claims that were not entertained by the state court due

to the petitioner's failure to (1) raise those claims in the state courts while state remedies were available, or (2) comply with a state procedural rule that prevented the state courts from reaching the merits of the claims. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006).

Here, all of the sub-claims that Petitioner attempts to assert were never properly raised in state court. Because Petitioner never presented these claims to the TCCA on direct appeal from his judgment of conviction those claims are unexhausted and not reviewable by the Court under § 2254. Moreover, Petitioner is now precluded from raising any of those claims in a state post-conviction proceeding as the time for seeking such relief long since has passed. T.C.A. § 40-30-102(a) and (b); *Seals v. State*, 23 S.W.3d 272, 276 (Tenn. 2000).

A petitioner who fails to raise his federal claim in the state courts and who is now barred by a state procedural rule from returning with the claim to those courts has committed a procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). A procedural default forecloses federal habeas review, unless the petitioner can show cause to excuse the failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation. *Id*. at 750.

As a "cause" for not including the above-mentioned sub-claims on direct appeal, Petitioner asserts, "[d]efense counsel failed to object, preserve, or raise the issue." [Doc. 1 p. 6]. Respondent interprets this excuse for the procedural default as a claim of ineffective assistance of appellate counsel [Doc. 10 p. 20]. However, Respondent argues that Petitioner is unable to establish the cause necessary to excuse his procedural default of these sub-claims [*Id*.].

Indeed, while ineffective assistance of appellate counsel can constitute cause for a procedural default, "an ineffective assistance of counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted." *Edwards v. Carpenter*, 529 U.S.

446, 453 (2000) ("To serve as cause to excuse the default, a claim of ineffective assistance of appellate counsel must be properly exhausted."); *Hodges v. Colson*, 727 F.3d 513, 529 (6th Cir. 2013). Here, Petitioner has never raised a claim for ineffective assistance of appellate counsel in the state courts. Thus, this claim is unexhausted, but because Petitioner did not submit this issue for the state court's review, and because the time for doing so has passed, the claim is considered exhausted but procedurally defaulted. See *Cone v. Bell*, 243 F.3d 961, 967 (6th Cir. 2001) (citing *Coleman*, 501 U.S. at 752-53), rev'd on other grounds, 535 U.S. 635 (2002) (concluding that "[i]f the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred.")

As a result, for Petitioner to use the claim for ineffective assistance of appellate counsel as "cause" for his failure to exhaust his prosecutorial-misconduct claims, he must first meet the "cause" and "prejudice" standard for the claim of ineffective assistance of appellate counsel itself. See *Edwards*, 529 U.S. at 451-53. Petitioner does not point to any "objective factor external to the defense" that prevented him from raising an ineffective assistance of appellate counsel in the state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Consequently, Petitioner has not established "cause" to overcome the procedural default of his claim for ineffective assistance of appellate counsel. As such, he cannot use appellate counsel's alleged ineffectiveness as cause to excuse his failure to raise the prosecutorial-misconduct claim in state court.[1] Accordingly, all of the sub-claims in Claim 1 are barred from review and will be dismissed.

---

[1] Although discussed in Respondent's response, the Court does not find it necessary to address *Martinez v. Ryan,* 566 U.S. 1 (2012) at this point in the analysis because Petitioner does not assert ineffective assistance of post-conviction counsel as cause to excuse the procedural default of his ineffective assistance of appellate counsel claim or the freestanding prosecutorial misconduct claim. *Martinez* only permits ineffective assistance of post-conviction counsel to

## B.    CLAIM 2: INEFFECTIVE ASSISTANCE OF COUNSEL

Next, Petitioner claims his conviction and sentence are void because his trial counsel was

ineffective [Doc. 1 p. 7].  Specifically, Petitioner lists the following 18 sub-claims:

(1)    Trial counsel improperly asked prospective juror Kim Graham if she would be in fear for her life if called to testify against Petitioner, and Petitioner was prejudiced when jurors heard her answer of yes. [Doc. 1 p. 18].

(2)    Trial counsel failed to object when the State questioned Deputy Bohannon regarding his prior interactions with Petitioner from previous occasions when he was dispatched to Petitioner's home on domestic disturbances. [Doc. 1 p. 18].

(3)    Trial counsel failed to object when the State, again, asked Deputy Bohannon, on re-direct examination, about his prior interactions with Petitioner. [Doc. 1 p. 18].

(4)    Trial counsel failed to move the trial court for a limiting instruction on how the jury should consider evidence that Deputy Bohannon had been dispatched to Petitioner's home on domestic disturbances. [Doc. 1 p. 18].

(5)    Trial counsel failed to ask the trial court to admonish the jury to disregard Deputy Bohannon's testimony that, when at Petitioner's home for domestic situations, Petitioner seemed to be very manipulative. [Doc. 1 p. 19].

(6)    Trial counsel elicited testimony from Deputy Bohannon that Petitioner seemed to be very manipulative; the very information trial counsel had objected to. [Doc. 1 p. 19].

(7)    Trial counsel failed to object to questions of Misty Thompson concerning her prescription for Xanax. [Doc. 1 p. 19].

(8)    Trial counsel improperly called William Burrell as a defense witness. [Doc. 1 p. 20].

(9)     Trial counsel elicited testimony from William Burrell that contradicted his claim of self-defense. [Doc. 1 p. 20].

---

excuse the default of ineffective assistance of trial counsel claims, and does not extend to "appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." *Martinez,* 566 U.S. at 1.  Moreover, *Martinez* does not apply to excuse the default of a claim of ineffective assistance of appellate counsel.  *Hodges v. Colson,* 727 F.3d 517, 531 (6th Cir.2013), *cert. denied,* —— U.S. ——, 135 S.Ct. 1545 (2015).

(10) Trial counsel failed to argue the overwhelming evidence that supported a claim of self-defense. [Doc. 1 p. 20].

(11) Trial counsel completely abandoned Petitioner's claim of self-defense. [Doc. 1 p. 21].

(12) Trial counsel failed to introduce evidence to support a defense that the killing occurred in defense of another. [Doc. 1 p. 21].

(13) Trial counsel failed to raise all evidence that would have supported a defense of intoxication. [Doc. 1 p. 22].

(14) Trial counsel failed to properly question defense witness, Dr. June Young, regarding the effects of mixing prescription drugs with alcohol. [Doc. 1 p. 22].

(15) Trial counsel ineffectively represented Petitioner by raising an insanity defense when no evidence supported that defense. [Doc. 1 p. 23].

(16) Trial counsel failed to timely secure and investigate records of Petitioner's mental health. [Doc. 1 p. 23].

(17) Trial counsel improperly called Dr. June Young to testify as a witness for his insanity defense, when her testimony did not support the defense. [Doc. 1 p. 23].

(18) Trial counsel failed to introduce all evidence that would have supported an insanity defense. [Doc. 1 p. 24].

In his state post-conviction petition, Petitioner raised the aforementioned claims of ineffective assistance of counsel. However, on appeal to the TCCA from the denial of his post-conviction petition, Petitioner failed to mention the above listed claims. Upon review, the TCCA affirmed the post-conviction trial court ruling.

Respondent argues that seventeen of the eighteen sub-claims of ineffective assistance of counsel should be dismissed based on procedural default [Doc. 10]. As cause to excuse his procedural default, Petitioner asserts the ineffective assistance of his post-conviction counsel [Doc. 1]. However, Respondent asserts that Petitioner's defaulted ineffective assistance of counsel sub-claims should remain dismissed because Petitioner has not met his burden of showing that the sub-

claims are substantial nor has he established any cause and actual prejudice to excuse the default [Doc. 10].

This Court agrees with Respondent in that Petitioner's sub-claims of ineffective assistance of counsel should be dismissed as procedurally defaulted, but differs in its reasoning.

### A. Governing Legal Rules on Ineffective Assistance of Post-Conviction Counsel Claims

Petitioner claims that his counsel at the post-conviction appellate proceeding was ineffective for failing to raise the relevant ineffective-assistance claims. Ineffective assistance of counsel at this stage of the case cannot constitute cause to excuse the procedural default because it is not an initial-review collateral proceeding. Although *Martinez* and *Trevino* expanded the class of cases in which a petitioner can establish cause to excuse the procedural default of ineffective-assistance claims, the Supreme Court cautioned that the rule "does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial." *Martinez,* 566 U.S. 1; *Trevino v. Thaler*, 569 U.S. 413 (2013). Where a petitioner alleges ineffective assistance of post-conviction counsel to establish cause to excuse his default of an ineffective assistance of trial counsel claim and alleges that the ineffective assistance of post-conviction counsel occurred only on appeal of his post-conviction petition, this exception does not apply because the appeal was not the first time the petitioner could have raised the claim. *Wallace v. Sexton*, 570 Fed. Appx. 443, 457, 2014 WL 2782009 (6th Cir. 2014). "While counsel's errors in [other levels of post-conviction] proceedings preclude any further review of the prisoner's claim, the claim will have been addressed by one court, whether it be the trial court, the appellate court on direct review, or the trial court in an initial-review collateral proceeding." *Id.* at 1316.

In the instant case, Petitioner's claims were properly presented to the post-conviction trial court, which denied all of his claims on the merits. Thus, the alleged ineffective assistance of

Petitioner's post-conviction appellate counsel is not cause to excuse the procedural default of his ineffective assistance of trial counsel claims, and the Court may not consider these claims on the merits.

The Supreme Court has not recognized ineffective assistance of post-conviction counsel as a free-standing constitutional claim, *see id.* at 1315, and Petitioner does not argue it as such here. Ineffective assistance of post-conviction counsel is relevant only if it is cause for failure to comply with a procedural rule. Petitioner has not shown that the error of his post-conviction trial counsel caused his non-compliance with a procedural rule in the post-conviction appellate court. Accordingly, his ineffective assistance of counsel sub-claims are procedurally defaulted and the Court need not consider them on the merits.

### B.      Sub-Claim 13

Sub-claim 13 was presented to both the post-conviction court and the TCCA and therefore, not procedurally barred like the rest of Petitioner's sub-claims. This sub-claim argues ineffective assistance of counsel by the trial counsel when he failed to raise all evidence that would have supported a defense of intoxication [Doc. 1 p. 22]. Specifically, Petitioner argues that trial counsel should have introduced evidence of the effect of mixing alcohol with Xanax to show that Petitioner was unable to form the required mental state for commission of an intentional or knowing killing of another [*Id.*].

Respondent argues that, although not procedurally barred from review, this sub-claim should be dismissed because the TCCA's rejection of the sub-claim was not contrary to and did not involve an unreasonable application of clearly established federal law and was not based on an unreasonable determination of facts in light of the evidence presented in the state court proceedings [Doc. 10 p. 39].

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. A defendant has a Sixth Amendment right not just to counsel but to "reasonably effective assistance" of counsel. *Strickland*, 466 U.S. at 687. To establish ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the proceedings unfair and the result unreliable. *Id.* In assessing counsel's performance, a court must presume that counsel's questioned actions might have been sound strategic decisions and must evaluate the alleged errors or omissions from counsel's perspective at the time the conduct occurred and under the circumstances of the particular case. *Id.* at 689; *see also Vasquez v. Jones*, 496 F.3d 564, 578 (6th Cir. 2007) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]") (quoting *Strickland*, 466 U.S. at 690). Only when the challenged actions are "outside the range of professionally competent assistance" will counsel's performance be considered constitutionally deficient. *Strickland*, 466 U.S. at 690.

To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for [counsel's acts or omissions], the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691; *see also Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). On balance, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceedings] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

When a petitioner raises an ineffective assistance of counsel claim in a § 2254 petition, the Court must review the state court's ruling on that claim under the highly deferential standard of the AEDPA. Thus, in order to succeed on a federal claim of ineffective assistance of counsel, a habeas petitioner must demonstrate that the state court's ruling on his ineffective assistance of counsel claim was an unreasonable application of *Strickland*. *Cone*, 535 U.S. at 693-94. "Surmounting *Strickland*'s high bar is never an easy task," and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105 (citing *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

Applying this governing legal standard for determining whether counsel was ineffective for failing to obtain an expert to develop defenses related to diminished capacity and the additive effect of the various substances in Petitioner's system at the time of the murder, the TCCA addressed the claim as follows:

> Based on his history of mental illness, his erratic behavior at the time of the offense, and his consumption of various drugs and alcohol, the Petitioner contends that trial counsel could have clearly demonstrated a particularized need for the appointment of an independent expert. Because his mental condition at the time of the alleged offense was a central issue, the Petitioner asserts that an expert could have investigated and consulted with counsel to develop defenses relating to diminished capacity and the additive effect of the various substances in the Petitioner's system. He claims that expert assistance would have lessened the degree of homicide.
>
> In its written order, the post-conviction court specifically held that the Petitioner was not entitled to relief for trial counsel's failure to procure an additional expert evaluation:
>
> > The court at trial found that no "particularized need" had been shown that would warrant a state-funded and new evaluation for the petitioner. The court's decision was upheld by the appellate court and cannot now be attacked in a petition for post-conviction relief by alleging that trial counsel was ineffective by not obtaining such a second evaluation.
>
> In addition, the court concluded that trial counsel presented adequate evidence of the Petitioner's mental history and level of intoxication at the time of the offense:

> [M]uch was made at trial by defense counsel of petitioner's level of
> intoxication at the time of the homicide and of his bizarre behavior.
> As the state accurately pointed out in closing argument at the hearing
> in this cause, the jury could easily have found the defendant guilty
> of First Degree Murder, and the fact that they returned a verdict of
> Second Degree Murder shows how effective trial counsel was in
> presenting these issues to a jury.

After a thorough review of the record, we agree with the post-conviction court and conclude that the Petitioner has failed to prove by clear and convincing evidence that he received ineffective assistance of counsel. At the post-conviction hearing, the Petitioner failed to call an expert witness or present any evidence to establish the existence of a mental disease or defect, which precluded him from forming the requisite intent to commit a knowing homicide. " 'As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.' " *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (quoting *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). Although the Petitioner called TBI Special Agent Dotson to testify as to the results of his toxicology and blood alcohol reports, there is no indication that her testimony would have been favorable, or even relevant, regarding his mental capacity to commit the offense. *See Denton v. State*, 945 S.W.2d 793, 802–03 (Tenn.Crim.App.1996) (citing *Black,* 794 S.W.2d at 757).

Further, it is significant to note that diminished capacity is not a defense to a criminal charge, but rather, a rule of evidence to show that the defendant lacked the requisite mens rea to commit the offense. *State v. Adams,* 405 S.W.3d 641, 660 (Tenn. 2013); *see also State v. Hall*, 958 S.W.2d 679, 688–89 (Tenn. 1997). The record shows that trial counsel was aware of the Petitioner's mental health history, substance abuse, and educational background. He reviewed the Petitioner's mental health records and interviewed the Petitioner's family. Dissatisfied with the conclusion of the initial forensic evaluation, trial counsel petitioned the trial court for a second evaluation but was denied the request. Ultimately, trial counsel did present the testimony of Dr. June Young to establish that the Petitioner suffered from various mental disorders, and the jury acquitted the Petitioner of first-degree murder. After perfecting the issue for direct appeal, this court rejected a similar claim and affirmed the Petitioner's second-degree murder conviction. While it is clear that the Petitioner has some educational difficulties and a troubled mental history, he has not established that he was incapable of forming the requisite mens rea for second degree murder, deficient performance of counsel, or prejudice at trial.

On the issue of voluntary intoxication, trial counsel testified that it was a strategic decision not to emphasize the Petitioner's consumption of alcohol and prescription medications on the night of the stabbing because he considered this evidence to be

"detrimental" to the case.  Even if counsel had incorporated voluntary intoxication as desired by the Petitioner, it would not have aided the Petitioner's defense.  *See State v. McKinney*, 603 S.W.2d 755, 760 (Tenn. Crim. App. 1980) ("Second-degree murder is not a specific intent crime, and voluntary intoxication will not mitigate, excuse, or justify this offense.") (citing *Harrell v. State*, 593 S.W.2d 664 (Tenn. Crim. App. 1979)).  Based on the record, we cannot conclude that the verdict in the Petitioner's trial was undermined or that the proceedings were fundamentally unfair because of trial counsel's failure to procure an independent psychiatric expert.  *See Strickland*, 466 U.S. at 670 ("[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.").  Because the Petitioner has not presented any evidence or an expert to establish how a mental disease or defect precluded his ability to commit a knowing murder, he has failed to establish prejudice.  Accordingly, the Petitioner has not met his burden of proof and he is not entitled to post-conviction relief.

*Coffey v. State*, 2014 WL 1632765, at *12–13.  In conclusion, the TCCA found that Petitioner failed to prove by clear and convincing evidence that he received ineffective assistance of counsel, and thus, affirmed the judgment of the post-conviction court [*Id*.].

Based on a review of the record, this Court finds that the state court's decision was not contrary to and did not involve an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings.  At the post-conviction hearing, trial counsel testified that he was aware that medical records reflected that Petitioner's psychiatric illness may be induced by alcohol [Doc. 7, State Court Record Attachment 28].  However, on this issue, trial counsel stated:

From a strategic standpoint in my representation of [the Petitioner], on one hand we thought we might could make a good issue or defense out of the fact that his use of intoxicants could exacerbate his mental problems, but then on the other hand— and we discussed this with [the Petitioner]—we knew that there was a potential jury charge out there about voluntary intoxication so we were walking a fine line about how much to raise that issue with the jury at trial.

*Coffey v. State*, 2014 WL 1632765, at *6.  This Court agrees with Respondent in that the state court was reasonable in deferring to a strategic decision that was based on thorough knowledge and reflected a reasonable, common-sense analysis of the case [Doc. 10 p. 42].  Petitioner has not met his burden of demonstrating that he is entitled to relief on this claim.  Accordingly, the Court

finds that the state court's rejection of sub-claim 13 was not unreasonable and, thus, it will be dismissed.

## V.    CONCLUSION

For the reasons set forth above, Petitioner's § 2254 petition [Doc. 1] will be **DENIED** and this action will be **DISMISSED**.

## VI.    CERTIFICATE OF APPEALABILITY

The Court must consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El*, 537 U.S. at 327, 336; *Slack*, 529 U.S. at 484.

After reviewing each of Petitioner's claims, the Court finds that Petitioner has not made a substantial showing of the denial of a constitutional right as to any claims. First, as to the procedurally defaulted claims, jurists of reason would not debate the Court's finding that the claims are procedurally defaulted. Further, in view of the law upon which the dismissal on the merits of the adjudicated sub-claim is based, reasonable jurists could not disagree with the correctness of

the Court's resolution of this claim.  Because the Court's assessment of Petitioner's claims could not be debated by reasonable jurists, such claims are inadequate to deserve further consideration, and the Court will **DENY** issuance of a COA. *See* 28 U.S.C. § 2253; Fed. R. App. P. 22(b); *Miller-El*, 537 U.S. at 327.

**A SEPARATE JUDGMENT ORDER WILL ISSUE.**


_____*/s/ Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE